**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:17-cv-616-RJC**
**(3:16-cr-40-RJC-DSC-1)**

| | | |
|---|---|---|
| **JESSICA ANNE BROWN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct

Sentence under 28 U.S.C. § 2255, (Doc. No. 1).

I.       **BACKGROUND**

A.  **Petitioner's Crime and Resulting Arrest.**

On November 15, 2012, a Grand Jury sitting in the Western District of North Carolina

returned a 14-count Indictment against Petitioner, charging her with wire fraud conspiracy

(Count I), wire fraud (Counts 2-9), money laundering conspiracy (Count 10), and international

money laundering (Counts 11-14), for her role in a Costa Rican-based telemarketing fraud that

swindled U.S. citizens into sending money in exchange for falsely promised sweepstakes prizes.

(United States v. Brown, No. 12-cr-370-1 ("Brown I"), Doc. No. 7: Indictment).  Petitioner was

arrested on those charges a year later, upon her return to the United States from Costa Rica.

At a November 19, 2013 detention hearing, Petitioner was released on a $25,000

unsecured bond, subject to the supervision of the U.S. Probation Office for the Middle District of

North Carolina (Greensboro).  The Magistrate Judge imposed various conditions of release,

including that Petitioner: report regularly to the Office of Probation and Pretrial Services;

surrender any passport; obtain no passport; travel only in the Western and Middle Districts of North Carolina, or as approved by the Office of Probation and Pretrial Services; abide by conditions of home detention; and submit to wearing a location monitoring device. (Brown I, Doc. No. 15: Order Setting Conditions of Release). Petitioner signed the order imposing these conditions. (Id.), confirming that she understood the conditions during the detention hearing. (Id., Doc. No. 87 at 8-10: Tr. of Detention Hearing).

On August 4, 2014, Petitioner pleaded guilty to Counts 1, 2, and 10 of the Indictment against her. (Id., Doc. No. 38: Plea Agreement). The Magistrate Judge continued Petitioner on her imposed terms of pretrial release until her sentencing hearing, which was scheduled for October 22, 2015. (Id., Doc. No. 88 at 23: Tr. of Plea and Rule 11 Hearing).

On October 1, 2015, three weeks before her sentencing hearing—and in contravention of her acknowledged release conditions—Petitioner applied for a U.S. passport card at Winston Salem State University. In her application, Petitioner declared "under penalty of perjury" that she was "not the subject of . . . a criminal court order forbidding [her] departure from the United States." (United States v. Brown, No. 3:16-cr-40 ("Brown II"), Doc. No. 22 at ¶ 10: Revised Final Presentence Investigation Report ("PSR")). Petitioner also declared that she intended to depart for Canada on October 11, 2015, eleven days before her scheduled sentencing hearing. (Id.). The State Department issued Petitioner a passport card on October 16, 2015. (Id.).

On October 22, 2015, this Court sentenced Petitioner to 60 months' imprisonment, varying downward substantially from Petitioner's advisory Guidelines range of 135 to 168 months' imprisonment. In determining Petitioner's sentence, the Court first accepted the Government's request for a 40 percent reduction in Petitioner's sentence under United States

Sentencing Guidelines ("U.S.S.G.") § 5K1.1(a) based on Petitioner's substantial assistance and value as a potential witness. (Brown I, Doc. No. 89 at 13: Tr. of Sentencing Hearing).

The Court then heard from Petitioner. She stated that she wanted "to express [her] remorse" and "accept responsibility" for her role in the telemarketing fraud scheme. (Id. at 19). She also professed to have "cooperated to the best of [her] abilities" and that she would "continue to be an assistant to the[] [government] in any way, shape, or form." (Id.). Petitioner then stated that she had "been on supervised release for almost two years" and "never had an offense." (Id.). She explained that she "was a victim of domestic violence for many years" and that she had experienced "substance abuse issues," but declared that she had worked to overcome those problems. (Id. at 19-20). Petitioner concluded by saying that she "want[ed] nothing more than to lead the rest of [her] life as a law-abiding citizen, productive member of society, and just to be a mother and a member of the community." (Id. at 20).

After hearing Petitioner's remarks, the Court further granted Petitioner a downward variance, sentencing her to only 60 months' imprisonment. In total, between the Section 5K1.1 departure and the variance, the Court sentenced Petitioner to a term that was 55 percent below the low end of her advisory Guidelines range. In announcing its decision, the Court cited, among other things, Petitioner's "lack of criminal activity, prior to and subsequent to her indictment in this case," and her "compliance with the terms of supervised release since indictment." (Id. at 25). The Court also allowed Petitioner to self-report for her sentence, explaining:

THE COURT: Ms. Brown, I will permit you to self-report when the marshals designate a time to report and a facility to report to. Between now and then you'll be under the same conditions of release that you're under now. And as long as you stay in compliance with these conditions, you'll be allowed to self-report when the marshals send you notice. Do you understand?

THE DEFENDANT: Yes, sir.

(Id. at 30).  The Court's judgment reiterated these terms.  (Brown I, Doc. No. 72: Judgment).

Three days later, on October 25, 2015, Petitioner fled to Canada.  Having sought and received Probation Office approval to travel on that date only to Asheville, North Carolina, Petitioner instead took her children and drove north.  (Brown I, Doc. No. 69 at 2: Notification of Bond Violation; Brown II, Doc. No. 10 at 3: Factual Basis).  Her location monitor last registered at 3:18 p.m. on Interstate 77, heading north toward West Virginia.  (Brown I, Doc. No. 69 at 1, 2).  Petitioner did not answer or respond to phone calls or emails from her assigned Probation Officer.  (Brown II, Doc. No. 10 at 3).  She also removed and disposed of her location monitor. (Id.).  Late in the day on October 25, 2015, Petitioner crossed into Canada from Buffalo, New York, using the passport card issued to her on October 16, 2015.  (Id. at 3; Brown II, Doc. No. 16-1 at 3: Arrest/Detention Notification).  As she entered Canada, Petitioner told Canada Border Service Agency ("CBSA") officers that she was "Jessica Anne Hollis" and that she was traveling to "visit a friend in Ottawa."  She did not report that she was a felon.  (Brown II, Doc. No. 16-1 at 3-4).

On October 26, 2015, Petitioner's assigned Probation Officer determined that Petitioner's residence had been vacated and that Petitioner had removed all of her personal belongings. (Brown I, Doc. No. 69 at 1, 2).  The Probation Office for the Western District of North Carolina then sought a warrant for Petitioner's arrest, which this Court issued on October 29, 2015. (Brown I, Doc. No. 69-1).  On November 19, 2015, the U.S. Marshals Service sent a notification to Petitioner at her Greensboro, North Carolina address—from which she had since absconded— directing her to surrender for service of her sentence at Federal Prison Camp Alderson, West Virginia, on December 15, 2015, "no later than NOON."  (Brown II, Doc. No. 22 at ¶ 14).

On November 19, 2015, CBSA officers arrested Petitioner in Edmonton, Canada, for suspected violations of Canadian immigration laws. (Brown II, Doc. No. 16-1 at 3). CBSA officers had located Petitioner and her children at the home of R.J. Summers, an individual who claimed on Facebook to be engaged to Petitioner. (Id.). At the time of her arrest, Petitioner admitted to CBSA officers that she had been "working as a telemarketer from her home in Canada." (Id. at 4).

On December 15, 2015, CBSA officers removed Petitioner from Canada, escorting her on a flight from Ontario, Canada, to Charlotte, North Carolina. (Brown II, Doc. No. 22 at ¶ 17). Petitioner arrived at the Charlotte Douglas International Airport at 12:15 p.m. Following her arrival, Deputy U.S. Marshals took custody of Petitioner and, consistent with the Court's outstanding arrest warrant, transported her to the Mecklenburg County Jail pending a December 18, 2015, bond revocation hearing. (Id.). Petitioner's children remained in the care of Canadian authorities.

**B. Petitioner's Guilty Plea and Sentencing.**

On February 16, 2016, the Grand Jury returned an Indictment against Petitioner, charging her with one count of failure to surrender for service of sentence, in violation of 18 U.S.C. §§ 3146(a)(2) & (b)(1)(A)(i), and one count of contempt, in violation of 18 U.S.C. § 401(3). (Brown II, Doc. No. 1: Indictment). The Court scheduled a June 6, 2016, trial on those charges. On June 1, 2016—less than five days before trial—Petitioner pleaded guilty to the Indictment against her. (Brown II, Doc. No. 11: Acceptance and Entry of Guilty Plea).

A draft pre-sentence investigation report was filed on July 13, 2017. (Brown II, Doc. No. 14: Draft PSR). On July 27, 2016, the Government filed objections to the draft PSR, arguing for an upward variance and two sentencing enhancements: a 3-level enhancement under 18 U.S.C. §

3147 and U.S.S.G. § 3C1.3 because Petitioner committed the relevant offenses while she was on release, and a 2-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. (Brown II, Doc. No. 16: Government's Objections to Draft PSR). Probation and Pretrial Services incorporated the Government's requested sentencing enhancements into a final pre-sentence report, filed on August 17, 2016. (Id., Doc. No. 17: Final PSR).

Petitioner's defense counsel filed a sentencing memorandum and objections to the final PSR on October 27, 2016, disputing the 2-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 on three grounds.[1] (Id., Doc. No. 20: Defendant's Objection to Final PSR and Sentencing Memorandum). First, Petitioner's attorney argued that the enhancement only applied to failure to appear for a "judicial proceeding," not failure to self-report for service of a sentence. (Id., Doc. No. 21 at 3). Second, he noted that the enhancement could apply to Petitioner's offenses only if she caused a "significant further obstruction" during the investigation of the charges against her. (Id.). Because her removal of the electronic monitoring device and her flight to Canada were the subject of those charges, he asserted, there were no grounds for finding a "significant further obstruction." (Id. at 3-4). Third, Petitioner's attorney suggested that applying the enhancement would lead to "impermissible double counting" of the offense conduct. (Id. at 4). Petitioner's counsel also argued that the Government's requested upward departure would lead to a sentence that was inappropriately harsh, and that Petitioner had already taken tangible steps to rehabilitate herself while she had been held in the Mecklenburg County Jail since her capture. (Id. at 5-6). He attached multiple documents recounting the counseling

---

[1] Petitioner's counsel also filed a revised version of the objections and sentencing memorandum on October 31, 2016. (Id., Doc. No. 21: Revised Objection to Final PSR and Sentencing Memorandum). A revised final PSR was filed on November 1, 2016, incorporating all of Petitioner's objections. (Id., Doc. No. 22: Revised Final PSR).

and trainings she had undergone during her detention and documenting her work as a library assistant at the jail. (Id., Doc. No. 21-1: Exs. to Sentencing Memo.).

On November 3, 2017, the Court conducted a sentencing hearing. Petitioner's attorney again raised the three objections to the 2-level obstruction of justice enhancement briefed in his sentencing memorandum. (Id., Doc. No. 34 at 3-6: Sentencing Hearing Tr.). In addition, he argued that Petitioner's entry into Canada did not significantly impede the Government's investigation because her location was easily ascertained just days later from a Facebook post, and the Government had not presented any evidence of the "substantial law enforcement effort" that it claimed was required to bring Petitioner back to the United States. (Id. at 4, 9). The Court overruled the objections and announced that it would apply the 2-level enhancement. (Id. at 10).

The Court next heard arguments about the appropriate sentence. Petitioner's counsel reiterated his argument that an upward departure was not warranted because a sentence within the Guidelines would appropriately address the 18 U.S.C. § 3553(a) factors. (Id. at 11). He pointed out that a sentence of 21 months, at the low end of the Guidelines range, would add nearly two years to the five-year sentence Petitioner had already received. (Id.). When Petitioner's original release date came and passed in five years, he suggested, her continued incarceration would be "a punishment that she will feel over, and over again, while incarcerated, while away from her kids." (Id. at 11-12). Moreover, he asserted, a 21-month sentence would be adequate to serve as "a reminder to her and anyone else who might think about" fleeing their sentence that "this is a serious offense and . . . it will be punished." (Id. at 12).

Petitioner then addressed the Court. She stated that after she was sentenced, her desire to keep her children from being placed in foster care caused her to "ma[k]e a terrible decision to actually put into practice something I had thought about doing," namely taking her children and

fleeing to Canada. (Id. at 13). She also stated that she was "ashamed and . . . embarrassed" by her decision, and that she "ha[d] been working very hard this past year between therapy, classes, and a lot of time spent in introspection and prayer to come to terms with" her bad decision and to "ma[k]e a lot of changes in [her]self." (Id. at 12, 14).

The Government argued that an upward variant sentence of at least 60 months was warranted because Petitioner had carried out a premeditated plan to avoid serving her sentence by fraudulently obtaining a passport card and fleeing the country. (Id. at 15). The Government noted that she had also concealed her plan by making false statements to the Court, to passport officials, and to Canadian border service agents. (Id. at 16). Moreover, once in Canada, per her own admission, Petitioner had once again taken up telemarketing, the very conduct for which she had professed remorse at her first sentencing. (Id. at 15-16). The Government also argued that Petitioner's actions formed a pattern of flight, given that Petitioner had gone to Costa Rica soon after being charged with defrauding a Texas nursing home in 2002. (Id. at 17). Finally, the Government explained that Petitioner had "destroyed her value as a government cooperator" by "br[eaking] her trust with the Court and the government" and that she had acted "indifferent[ly] to the resources that the United States and Canada had to expend to bring her back into custody." (Id. at 18).

Addressing the Government's assertion that Petitioner's conduct had been premeditated, Petitioner's counsel responded that there was "no indication" that Petitioner had applied for the passport card to avoid serving her sentence, and that "there is no way to know whether in fact Ms. Brown . . . would have actually surrendered" to serve her sentence on the date ordered by the U.S. Marshals Service had she not already been in custody. (Id. at 20).

The Court sentenced Petitioner to 48 months of imprisonment, stating that it was troubled that Petitioner had, at her original sentencing, "express[ed] . . . remorse and her . . . desire to lead a law-abiding life" and "indicat[ed] to me that she was in compliance with the terms of release" when three weeks earlier she had obtained a passport card in violation of her terms of release by lying to the issuing officials about her release status.  (Id. at 22).  The Court also noted that Petitioner had told her Probation Officer that she was going to Asheville when instead she went to Canada; that she cut off her location monitoring bracelet; that she lied to Canadian border officials; that her flight appeared premeditated; and that Petitioner had also fled to a foreign country after being charged in the Texas case.  (Id. at 22-23).  These factors together, the Court explained, painted a picture of someone who was "extraordinary in terms of her efforts at evading her surrender for sentence and should be treated in a more serious way."  (Id. at 23).

### C.  Petitioner's Appeal and Motion to Vacate Her Sentence.

On November 15, 2017, Petitioner filed a notice of appeal of her conviction and sentence. Before briefing had commenced, however, Petitioner filed a motion to dismiss the appeal. United States v. Brown, No. 16-4751 (4th Cir. Feb. 8, 2017).  The Fourth Circuit dismissed her appeal and issued the mandate the same day.  Id.  On October 17, 2017, Petitioner filed her Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255.  (Brown v. United States, No. 17-cv-616 ("Brown III"), Doc. No. 1: Motion to Vacate).

Petitioner argues in her Section 2255 motion that the Court should vacate her sentence and resentence her because her attorney provided ineffective assistance of counsel before and during sentencing by: (1) not raising her mental health and emotional issues as mitigating factors; (2) failing to rebut statements made by the Government during sentencing that she claims are either mischaracterizations or untrue; (3) declining to present evidence of her post-

offense rehabilitation efforts; and (4) failing to defend her in a manner that would preserve her value to the Government as a cooperator so that she could obtain a downward departure under U.S.S.G. § 5K1.1.  The Government filed its response in opposition on January 22, 2018.  (Doc. No. 8).  On June 19, 2018, the Court granted Petitioner's motion for an extension of time in which to file a Reply.  (Doc. No. 11).  Petitioner did not file a Reply and the time to do so has passed.  Thus, this matter is ripe for disposition.

## II.  STANDARD OF REVIEW

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein.  After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law.  See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.  DISCUSSION

### A.  Petitioner's Claims of Ineffective Assistance of Counsel.

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense.  See U.S. CONST. amend. VI.  To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him.  See Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010).  Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant

relief under . . . <u>Strickland</u> if the 'result of the proceeding was fundamentally unfair or unreliable.'" <u>Sexton v. French</u>, 163 F.3d 874, 882 (4th Cir. 1998) (quoting <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." <u>Bowie v. Branker</u>, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." <u>United States v. Rhynes</u>, 196 F.3d 207, 232 (4th Cir. 1999), <u>opinion vacated on other grounds</u>, 218 F.3d 310 (4th Cir. 2000).

To establish prejudice in the context of a guilty plea, a petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Meyer v. Branker</u>, 506 F.3d 358, 369 (4th Cir. 2007) (quoting <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985)). In evaluating such a claim, statements made by a defendant under oath at the plea hearing carry a "strong presumption of verity" and present a "formidable barrier" to subsequent collateral attacks. <u>Blackledge v. Allison</u>, 431 U.S. 63, 73-74 (1977). Indeed, "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should dismiss . . . any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." <u>United States v. Lemaster</u>, 403 F.3d 216, 221-22 (4th Cir. 2005).

**i. Petitioner's Mental Health and Emotional Issues.**

Petitioner first argues that counsel provided ineffective assistance by failing to raise, at sentencing, Petitioner's mental and emotional health issues and her history as a domestic abuse victim. (Brown III, Doc. No. 1-1 at 3-5: Memo. in Support of Motion to Vacate). She claims that this failure "deprived the Court" of information about her history, and consequently precluded the Court from considering that information, both as a possible basis for a U.S.S.G. §

5H1.3 downward departure,[2] and as part of the 18 U.S.C. § 3553(a) factors at sentencing. (Id.). Contrary to Petitioner's assertion, however, the Court was not deprived of information, and her counsel's decision not to focus on her mental health history was a reasonable strategic choice.

Strategic decisions made by an attorney about whether to present certain kinds of evidence are "virtually unchallengeable" if those choices are "made after thorough investigation of law and facts relevant to plausible options." Strickland, 466 U.S. at 690. According to Petitioner, she informed her attorney of her mental health issues and history of mental, physical, and emotional abuse in 2013 when he began serving as her counsel in the wire fraud case. (Brown III, Doc. No. 1-1 at 3, 4). Her counsel subsequently "conducted personal interviews with Ms. Brown himself and through his investigator, Kimberly Ellington," and "requested documentation" of these issues from numerous sources, documents that Petitioner herself viewed during discovery. (Id. at 3).

Nevertheless, after conducting this inquiry, Petitioner's counsel decided not to present evidence of her mental health and domestic abuse history during her sentencing for the contempt and failure to report charges. This was a reasonable strategic choice for at least two reasons. First, the Court was already aware of Petitioner's mental health and domestic abuse issues. The PSR stated that Petitioner had reported "suffer[ing] domestic violence (physical, mental, sexual and emotional abuse)" at the hands of her husband "for the 16 years prior to her arrival in the United States from Costa Rica in 2013." (Brown II, Doc. No. 22 at ¶ 49). The PSR further noted that Petitioner had attempted suicide in Costa Rica in 2003 "as a result of the domestic

---

[2] Petitioner lists several cases in which she claims that post-traumatic stress disorder ("PTSD") and other mental or emotional conditions "have been cited as a mitigating factor for a 5H1.3 departure." (Brown III, Doc. No. 1-1 at 3, 5). The Government states in its response that, of the cases Petitioner cited that the Government could locate, none actually involved U.S.S.G. § 5H1.3 departures.

violence she allegedly suffered at the hands of her husband," and that she had been diagnosed with post-traumatic stress disorder ("PTSD") "as a result of her domestic violence." (Brown II, Doc. No. 22 at ¶ 54). Moreover, the PSR in Petitioner's earlier case provided the same information, and at the sentencing in that case Petitioner herself discussed the fact that she had had been "a victim of domestic violence for many years" and that, as a result, she had experienced "substance abuse issues." (Brown I, Doc. No. 53 at ¶¶ 55 & 59: Final Presentence Investigation Report), Doc. No. 89 at 19-20). Petitioner's sentencing for the contempt charges, which occurred only a year later, involved the same Court, the same parties, and the same attorneys. Hence, the Court already was aware of her history, and it was reasonable for Petitioner's attorney instead to focus on new arguments that he and Petitioner had not previously brought to the Court's attention. See Williams v. Kelly, 816 F.2d 939, 950 (4th Cir. 1987).

Second, Petitioner's mental health and domestic violence history played an important role in the Court's decision to grant her a substantial downward variance at her first sentencing. The Court itself acknowledged that it had granted Petitioner a sentence 55% below the bottom of the Guidelines range—even lower than the downward departure requested by the Government—"as a result of [Petitioner's] statements" during the sentencing hearing. (Brown II, Doc. No. 34 at 22). Those statements included an acknowledgement of the role that Petitioner felt her history of domestic abuse and resulting mental, emotional, and substance abuse problems played in her decision to commit the wire fraud crimes. (Brown I, Doc. No. 89 at 19-20). Three days after receiving this lenient sentence, however, Petitioner fled to Canada to avoid serving her time. Rather than making the most of the Court's compassion and working to rehabilitate her life, Petitioner attempted to evade responsibility. It was, therefore, reasonable for her counsel to decide not to focus his arguments on asking the Court to grant her the same forbearance again.

See Strickland, 466 U.S. at 690 (stating that "the reasonableness of counsel's challenged conduct" must be judged "on the facts of the particular case, viewed as of the time of counsel's conduct").

Even assuming that her counsel's strategic decision was objectively unreasonable, Petitioner cannot succeed on her claim because she fails to demonstrate a "reasonable probability" that his performance affected the outcome of her sentencing. See Strickland, 466 U.S. at 694. Petitioner's mental health and domestic abuse history could have warranted a downward departure under U.S.S.G. § 5H1.3 only "if such conditions, individually or in combination with other offender characteristics, [we]re present to an unusual degree and distinguish[ed] [her] case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.3. While the conditions Petitioner claims she experiences as a result of her husband's domestic abuse—which include PTSD, anxiety, and depression—are not to be minimized, she has not argued that those conditions are present to such an unusual extent that they distinguish her case from those of other offenders. See United States v. Maddox, 48 F.3d 791, 798 (4th Cir. 1995) (holding that no U.S.S.G. § 5H1.3 downward departure was warranted where the defendant had dependent personality disorder, which a psychologist testified was "not unusual among inmates"); Mann v. United States, 66 F. Supp. 3d 728, 743 (E.D. Va. 2014) (finding that counsel did not provide ineffective assistance by failing to argue for a U.S.S.G. § 5H1.3 departure where the defendant "ha[d] not shown that he suffered from" PTSD "to an unusual degree"). As a result, even if counsels performance was deficient, this could not have prejudiced Petitioner for purposes of a U.S.S.G. § 5H1.3 departure.

In addition, the performance of Petitioner's counsel related to emphasizing her conditions could not have prejudiced her for purposes of the Court's 18 U.S.C. § 3553(a) analysis,

because—as noted—information about Petitioner's PTSD diagnosis and domestic abuse was presented to the Court in her PSR and during her first sentencing. Moreover, given that the Court found Petitioner's conduct "premeditated" and to involve "extraordinary deception," it is unlikely that any further argument about PTSD or past domestic abuse would have led the Court to attribute Petitioner's flight solely to the effects of a mental condition. (Brown II, Doc. No. 34 at 22-23). Consequently, Petitioner cannot show any probability of prejudice "sufficient to undermine confidence" in her sentence. Strickland, 466 U.S. at 694.

**ii. The Government's Purported Mischaracterizations.**

Petitioner next claims that her attorney's performance fell below the expected range of competence because he failed to correct alleged mischaracterizations in the sentencing record. (Brown III, Doc. No. 1-1 at 6-16). However, many of her purported corrections are either misleading or immaterial, and thus they would not have changed the factors upon which the Court based its sentencing decision. Moreover, taken together, her objections would have portrayed her as a defendant who seized on minor discrepancies in an attempt to avoid accepting responsibility for her actions. Cf. Faucett v. United States, 872 F.3d 506, 512 (7th Cir. 2017) (holding that counsel was not ineffective for refusing to argue diminished capacity as a mitigating factor, when doing so "would have undermined the defense effort to show acceptance of responsibility"). It was, therefore, objectively reasonable for her counsel to forego such factual contentions and instead focus on legal arguments that could significantly reduce her Guidelines sentencing range. See Williams, 816 F.2d at 950.

Specifically, Petitioner alleges the following factual deficiencies:

**Premeditation.** Petitioner contends that her attorney should have argued to the Court that her actions were not "premeditated." (Brown III, Doc. No. 1-1 at 6). This argument is

meritless because Petitioner fails to deny or rebut any of the basic facts upon which the Court found her conduct premeditated. Petitioner does not deny that she applied for a passport card with a stated destination of "Canada" three weeks before her sentencing. In fact, she admits that before her sentencing she considered using that passport card to escape to Canada. (Id.; Brown II, Doc. No. 34 at 13).[3] Details such as the fact that she "only" applied for her passport card three weeks in advance, that she waited to flee until after she learned that she had been sentenced to jail time,[4] and that she felt panic after her sentencing do not change the fact that she took deliberate steps to secure a passport card in advance of her sentencing so that she could avoid her sentence by fleeing the country. A decision by defense counsel to "[r]efrain[] from [making] a meritless sentencing argument cannot be characterized as objectively unreasonable." Faucett, 872 F.3d at 512. Thus, it was reasonable for her attorney not to dispute whether her flight was premeditated.

Petitioner also contends that she did not abscond to Canada with the intention of avoiding her sentence. The factual basis for her plea, however, states the opposite. (Brown II, Doc. No. 10 at 3 ("BROWN fled to Canada with the intent of avoiding service of her ordered 60-month sentence.")). Petitioner confirmed that she had read and agreed with that document at her change

---

[3] Moreover, the fact that Petitioner fully vacated her residence when she left for Canada, taking her children and all of her belongings with her, further indicates that she had a premeditated plan to leave for Canada permanently, and not just for a short period to settle her children, as she contends. Petitioner disputes that she removed all of her belongings from her residence, but a senior Probation Officer attested to the fact, in a signed memorandum under penalty of perjury, that she had vacated her residence. (Brown I, Doc. No. 69 at 1, 2).

[4] The PSR states that the State Department issued Petitioner a passport card on October 16, 2015, but the record does not reflect when Petitioner actually received that passport card. (Brown II, Doc. No. 22 at ¶ 10). The Government notes that it is possible that Petitioner did not receive the passport card until after her sentencing, and she was therefore unable to flee to Canada before she was sentenced.

of plea hearing, and her petition does not challenge its validity. (Brown II, Doc. No. 33 at 8: Tr. of Plea and Rule 11 Hearing). Hence, it was reasonable for Petitioner's counsel not to dispute her intent.

**Lack of Remorse.** Petitioner criticizes her attorney for not responding to statements by the Government and the Court that her actions demonstrated a lack of remorse. (Brown III, Doc. No. 1-1 at 7-9). But Petitioner's own actions established that she lacked contrition. When the time came to accept responsibility by reporting for her sentence, Petitioner fled to Canada, demonstrating that she was not regretful enough of her past crimes to keep her promise to the Court to "lead the rest of [her] life as a law-abiding citizen." (Brown I, Doc. No. 89 at 20). Consequently, Petitioner's attorney could reasonably have decided against touting Petitioner's supposed remorsefulness.

Moreover, Petitioner herself expressed her remorse for her actions in her allocution at her sentencing for the contempt and failure to surrender charges. She stated, "I'm ashamed and I'm embarrassed that I'm once again in this courtroom facing sentencing." (Brown II, Doc. No. 34 at 12). She explained that she was "disappointed" in herself, and acknowledged that she had "made a bad decision," and that she "kn[e]w [she] was wrong." (Id. at 12, 14). She stressed that she had "worked very hard over the past year to truly come to terms with the gravity of [her] situation and the severity of the consequences of [her] actions." (Id. at 12-13). She concluded by "apologiz[ing] to the Court for [her] conduct," stating that there was "no excuse" for her behavior. (Id. at 14). Petitioner's attorney reasonably could have believed that it would be more effective for the Court to hear about her remorse directly from Petitioner herself, rather than second-hand from her attorney.

**"Material Lies" to Canadian Border Agents.**  Petitioner argues that she did not lie to Canadian border agents about her destination or her status as a felon, and she asserts that her attorney should have undertaken an investigation to corroborate her truthfulness.  (Brown III, Doc. No. 1-1 at 9-10).  Petitioner does not deny, however, that she failed to tell CBSA officials about her felon status when she crossed the border, nor does she deny that that she never went to Ottawa and that she failed to inform CBSA officials that her final destination was actually Edmonton.  Although Petitioner may not have affirmatively lied, therefore, she still misrepresented her status and intentions through omission.  An attorney's strategic decision not to spend time and resources investigating an issue raised by his client is "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91.  The decision by Petitioner's attorney not to investigate or argue this issue was a reasoned professional judgment.

Petitioner further avers that the Government mischaracterized her statement at her wire fraud sentencing that she had "never had an offense" during her supervised release.  (Brown III, Doc. No. 1-1 at 9; Brown I, Doc. No. 89 at 19).  The Government and the Court interpreted her statement to mean that she had not committed a subsequent offense while awaiting sentencing; according to Petitioner, she meant simply to say that she had not been convicted of a subsequent offense.  This interpretation is contrary to the obvious connotation of her statement, which was made during a speech in which Petitioner also said that she had "done everything they asked me to do," and that she "want[ed] nothing more than to lead the rest of [her] life as a law-abiding citizen."  (Brown I, Doc. No. 89 at 20).  Moreover, even if this was Petitioner's intended meaning, given her prior and subsequent misleading and false statements in her passport card

application, to her Probation Officer, and to CBSA officials, such an argument would not have been credible.

**Use of a False Name.**  Petitioner next complains that her attorney should have pointed out that "Jessica Anne Hollis" was not a false name, but rather her maiden name.  (Brown III, Doc. No. 1-1 at 11).  Petitioner admits, however, that she legally changed her name from "Hollis" to "Brown" when she married.  While Petitioner may have resumed using the name "Hollis" informally, the divorce order permitting her legally to resume that name was not signed until January 13, 2016—months after she gave the name "Hollis" to Canadian law enforcement officials.  (Brown III, Doc. No. 1-2 at 75-76: Exs. in Support of Motion to Vacate).  Thus, it was reasonable for her attorney not to raise this argument.

**Petitioner's Purported Trip to Asheville.**  Petitioner next claims that she did, in fact, travel to Asheville on October 25, 2015, as she told her Probation Officer that she would, and therefore she did not lie to her Probation Officer when she obtained permission for the trip.  (Brown III, Doc. No. 1-1 at 13).  Even assuming this is true—and her GPS tracking information suggested otherwise—Petitioner still lied by omission when she neglected to report that she would be continuing to Canada after visiting Asheville, and when she refused to answer her Probation Officer's calls after her GPS tracker showed that she had left the state.  Once again, therefore, it was reasonable for her counsel to forego this argument.

**Indifference to Law Enforcement Efforts.**  Petitioner next asserts that her attorney failed to defend her from the Government's "exaggerat[ion]" of the "difficulty, costs and manpower necessary" for U.S. and Canadian law enforcement agents to locate her and return her to the United States, as well as from the accusation that she was "indifferent" to those efforts.  (Brown III, Doc. No. 1-1 at 13).  This assertion is without merit.  Petitioner's attorney raised this

issue multiple times, including twice during her sentencing hearing and once in her sentencing memorandum. (Brown II, Doc. No. 34 at 4, 9; Doc. No. 21 at 4 n.4). The sentencing memorandum noted that she "was easily located and arrested in Canada based on a public Facebook post disclosing her location and who she was with," and at sentencing her attorney argued that the Government had not "articulated any underlying facts that would support" the contention that her conduct resulted in a significant obstruction requiring substantial resources to locate her. (Id.).

**The Texas Charges.** Petitioner next faults her attorney for failing to argue that she could not have been fleeing the forgery charges filed against her in Texas when she moved to Costa Rica because she was never served with a warrant for those charges. (Brown III, Doc. No. 1-1 at 14-15). The Government, however, presented substantial evidence, including copies of forged checks, that Petitioner had committed the alleged forgery; and, upon committing the forgery, Petitioner would have been aware that she could be prosecuted for her crimes, providing her ample motive to flee. (Brown II, Doc. No. 16-3: Texas Police Report). Moreover, an Incident Report from the Ennis Police Department included in the record shows that Petitioner was confronted with her crimes by the director of the senior center from which she had obtained the checks she forged. (Id. at 2). Thus, Petitioner was also aware that her forgery had been discovered and likely reported.

Taken together, the decision by Petitioner's counsel not to focus his arguments on the various factual recharacterizations Petitioner raises was a reasoned professional judgment about the most effective way to represent his client's interests. See Strickland, 466 U.S. at 689 (explaining that, because "[t]here are countless ways to provide effective assistance in any given case," a defendant "must overcome the presumption that, under the circumstances, the

challenged action 'might be considered sound trial strategy'" (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955))).

Even if Petitioner's counsel somehow erred by not belaboring each of the points she now raises, his strategic choice not to correct those purported mischaracterizations did not prejudice Petitioner. The factors Petitioner disputes that the Court actually relied on in crafting her sentence, such as the premeditation of her flight, her intention to avoid serving her sentence, and her prior flight from Texas forgery charges, were supported by ample undisputed evidence. Other factors disputed by Petitioner, such as her return to illegal telemarketing, were not cited by the Court as reasons for the sentence imposed. And still others, such as the remorse that she claims motivated her cooperation and acceptance of responsibility in her first case, were already known to the Court (which sentenced her in the prior case) when it imposed her sentence.

Here, Petitioner's sentence was based on the Court's assessment that her conduct was "premeditated" and involved "extraordinary deception." Petitioner's application for a passport card in violation of the terms of her release; her lies to passport officials in that application; her deceptive statement to the Court that she wished to be a "law-abiding citizen" when she had violated her conditions of release just weeks before; her misleading representation to her Probation Officer that she was traveling only to Asheville (and not also to Canada); her decision to cut off her location monitoring bracelet; the willful omissions in her statements to Canadian border agents; and her pattern of flight from law enforcement all supported these conclusions. Even if Petitioner's counsel had raised every one of her suggested arguments, none of the aspects of her conduct relied on by the Court would have been disproven. And even if the Court would have somehow discredited some of these factors based on Petitioner's arguments, her sentence would still reasonably stand due to the sheer number of factors that made her premeditation and

deception "extraordinary." See United States v. Merritt, 102 F. App'x 303, 312 (4th Cir. 2004) (finding no reasonable probability that the defendant's sentence would have been different because the Court relied upon multiple "factors that were present to an exceptional degree" in imposing an upward departure).

### iii. Petitioner's Post-Offense Rehabilitation.

Petitioner next argues that her counsel failed to "present evidence of [her] significant post-offense rehabilitation efforts." (Brown III, Doc. No. 1-1 at 17). Petitioner is incorrect. In the sentencing memorandum her attorney filed, he both raised the issue of her post-offense rehabilitation and provided supporting documentation: "Brown accepts responsibility for her offense and has taken tangible step[s] to rehabilitate herself while incarcerated at the Mecklenburg County Jail. . . . Specifically, Petitioner successfully participated in personal counseling sessions and religious studies. She has served as a jail librarian assisting other inmates in their educational and literacy pursuits. . . . The Court should consider these efforts when sentencing Brown." (Brown II, Doc. No. 21 at 6). Petitioner's attorney also attached to his motion multiple letters written by staff of the Mecklenburg County Jail which he said "laud[ed] her rehabilitative efforts, including contributions to assist other inmates." (Id.; Brown II, Doc. No. 21-1 at 1-5). Petitioner thus cannot demonstrate with sufficient evidence that her counsel's actions were deficient, let alone that they were so deficient that her attorney "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687.

Petitioner's ineffective assistance claim also fails because she cannot show that she was prejudiced by any unreasonable performance by counsel. To the extent that Petitioner's complaint addresses the fact that counsel did not raise her rehabilitative efforts orally at her

sentencing hearing, she suffered no prejudice from that decision because Petitioner herself discussed those efforts during her statement to the Court. (Brown II, Doc. No. 34 at 14 ("And I have been working very hard this past year between therapy, classes, and a lot of time spent in introspection and prayer to come to terms with why I made the bad decisions I made with respect to my first offense . . . and I have made a lot of changes in myself . . . .")). The Court, which noted its careful consideration of all filings and submissions, was thus doubly aware of Petitioner's efforts through her remarks and counsel's filings, and it was able to consider those efforts when it crafted a sentence in accordance with the 18 U.S.C. § 3553(a) factors. In addition, although Petitioner asserts that her rehabilitative efforts could have made her eligible for a downward departure, she does not identify the departure to which she is referring.[5] (Brown III, Doc. No. 1-1 at 17). Post-offense rehabilitation efforts may be considered in granting a downward departure for acceptance of responsibility under U.S.S.G. § 3E1.1, but Petitioner's sentence was based on a Guidelines calculation that already included a 2-level downward departure under § 3E1.1, the largest departure she could receive under that provision.[6] (Brown II, Doc. No. 22 at ¶ 33). Petitioner thus has not shown that, but for her counsel's alleged

---

[5] Petitioner cites a case, United States v. Slappy, 872 F.3d 202 (4th Cir. 2017), in which the Fourth Circuit vacated the defendant's sentence and remanded for resentencing because the district court imposed the statutory maximum sentence without even considering detailed evidence presented by the defendant of her rehabilitation efforts as a mitigating factor favoring a within-guidelines sentence. The Court did not, however, discuss any applicable departures in that case. Petitioner also cites "US vs. Brown, 2005," "US vs. Koons, 1996," "US vs. Barker, 2014," and "US vs. Lapp, 2016," but the Government states that it was not able to find any relevant cases with those titles and dates.

[6] The Government did not move to provide Petitioner with an additional one-level downward departure under U.S.S.G. § 3E1.1(b) because Petitioner pled guilty only five days before her trial was set to begin, and therefore she did not "permit[] the government to avoid preparing for trial" by "timely notifying authorities of h[er] intention to enter a plea of guilty." U.S.S.G. § 3E1.1(b); (Brown II, Doc. No. 19 at 6: Government's Sentencing Memo.).

errors, there was a reasonable probability that she would have received a lower sentence. As a result, she has not satisfied the prejudice prong of the <u>Strickland</u> test.

### iv. Petitioner's Loss of Status as a Government Cooperator.

Finally, Petitioner argues that all of the alleged errors by her attorney cumulatively prejudiced her by destroying her credibility with the Government. She contends that if her attorney had disputed all of the purported mischaracterizations discussed above and raised her mental health issues and post-offense rehabilitative efforts, she would have been allowed to continue serving as a cooperator for the Government and again could have been granted a U.S.S.G. § 5K1.1(a) downward departure. For all of the reasons stated above, however, her counsel's strategic decisions about which arguments to present to the Court were well "within the range of competence demanded of attorneys in criminal cases." <u>Strickland</u>, 466 U.S. at 687. Moreover, as explained further below, Petitioner's own actions impeached her credibility to the point where she could not have continued to serve as a Government cooperator regardless of any mitigating factors that her attorney could have brought to the Government's attention. Therefore, it was objectively reasonable for her attorney to have focused on other arguments that had a better chance of success. <u>See</u> <u>Williams</u>, 816 F.2d at 950.

Additionally, even assuming that the performance of Petitioner's counsel was in some way deficient, Petitioner's ineffective assistance claim fails because she cannot show a "reasonable probability" that she was prejudiced. <u>See</u> <u>Strickland</u>, 466 U.S. at 694. Among the factors to be considered by the Court in granting a substantial assistance departure, and by the Government in recommending one, are the "significance and usefulness of the defendant's assistance" and the "reliability of any information or testimony provided by the defendant." U.S.S.G. § 5K1.1(a)(1) & (2). As the Government explained at her sentencing, Petitioner's own

actions impeached her credibility and "destroyed her value as a government cooperator," rendering any potential future cooperation useless. (Brown II, Doc. No. 34 at 18). Petitioner lied to passport officials about her release status. She lied to the Court by saying that she "want[ed] nothing more than to lead the rest of [her] life as a law-abiding citizen" when she had illegally obtained a passport card in preparation for a potential flight from the country. (Brown I, Doc. No. 89 at 20). She deceived her Probation Officer about the final destination of her October 25, 2015, trip. She withheld material information from CBSA officials when she crossed the border into Canada. Even accepting all of Petitioner's arguments as true, none of these facts are in dispute. Petitioner's credibility as a Government witness who could take the stand and testify truthfully was shattered by these lies and misrepresentations. Thus, Petitioner's own actions rendered her useless as a cooperator, making it exceedingly unlikely that the Government would move to offer her a U.S.S.G. § 5K1.1(a) downward departure. The Court, therefore, rejects this final claim of ineffective assistance of counsel.

## IV.     CONCLUSION

For the foregoing reasons, the Court denies and dismisses Petitioner's § 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1.      Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1), is **DENIED** and **DISMISSED**.

2.      **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of

the constitutional claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: August 29, 2018

Robert J. Conrad, Jr.
United States District Judge